# EXHIBIT 1

Internal Revenue Service
Criminal Investigation Division

## Memorandum of Interview

| | | | |
|---|---|---|---|
| In Re: | Elliott Beals | Location: | REDACTED |
| Investigation #: | 040130031 | | Simsbury, Ct. |
| Date: | May 21, 2002 | | |
| Time: | 8:15 AM | | |
| Participant(s): | Albert Innarelli, Esq., Interviewee | | |
| | John J. Leahy, Witness | | |
| | Thomas F. Carroll, Jr., Special Agent | | |

1. Supervisory Special Agent John Leahy and I introduced ourselves to Attorney INNARELLI and showed him our credentials for his inspection. I told INNARELLI that we were working with the United States Attorneys office investigating a "land flip" or "property flip" scheme involving GEORGE PETROPOULOS and ELLIOTT BEALS. I told INNARELLI that were also looking into his involvement in the "land flip" scheme.

2. ALBERT INNARELLI said he graduated from Cathedral High School in Springfield, MA. in 1975. He received an undergraduate degree in accounting in 1979 from Western New England College and his Juris Doctor in 1990, also from Western New England College. INNARELLI said he is licensed to practice law in Massachusetts, but not in Connecticut. INNARELLI is also a Certified Public Accountant, licensed in Massachusetts in 1980 or 1981. INNARELLI said he worked for Richard Goldman, Esquire from 1990 through 1993.

3. INNARELLI said he knew that BEALS and PETROPOULOS were flipping properties. INNARELLI said flipping is not illegal, as long as the buyer is not being deceived, or there is not something seriously wrong with the house. INNARELLI repeated this statement a number of times during the course of the interview. INNARELLIA also stated that it is not against the law to make a profit on the sale of a house even if the seller only owned it for a very short period of time. INNARELLI used the analogy of selling stocks.

4. According to INNARELLI, BEALS and PETROPOULOS were buying properties at auction and fixing them up. INNARELLI said that sometimes they began fixing the properties before they had even bought them. INNARELLI said they had receipts for the repairs, but INNARELLI admitted that he never witnessed any of the building improvements.

5. When asked why he was always the closing attorney for the properties that BEALS and PETROPOULOUS "flipped" he said it was just coincidence and that the mortgage companies involved assigned the closings to him.

6. According to INNARELLI, BEALS and PETROPOULOS purchased these houses at auction with no appraisal. The properties were purchased with cash and with no mortgages.

7. INNARELLI said that most of the buyer mortgages were obtained through Equicredit. INNARELLI said the buyers were typically B & C grade buyers. Ted Jarrett was the

manager for the local Equicredit office. American Family Mortgage was a mortgage broker that BEALS and PETROPOULOS used before INNARELLI became involved with them. One other mortgage broker they used was James Smith with Springfield Mortgage Corporation. The usual mortgage broker's fee is between one and three points.

8. INNARELLI said Julie Roberts currently prepares his title searches and that she can be reached at the Hampden County Registry of Deeds. He also stated that prior to Julie Roberts, Helen O'Donnell conducted his title searches until her retirement approximately three years ago.

9. During the Years 1997 and 1998, INNARELLI worked on his own and did not have any staff. In 1999, Nancy Arroyo worked for him, and in 2000 he hired his current assistant, Joanne Tassinari.

10. INNARELLI said he does not represent the buyer, but he represents the Mortgage Company at the closing. SSA Leahy asked INNARELLI about a $350.00 closing fee on the seller's side of the HUD Settlement Statement, and INNARELLI said this fee was for document preparation. INNARELLI said the fee was not enough for representation. INNARELLI admitted that his name should appear on the line where this fee is noted, and he was aware that the line was left blank. SSA Leahy told INNARELLI the attorney's name is required to be disclosed relating to the payment and INNARELLI replied, "That's true" but gave no explanation as to why his name was not included on the form. INNARELLI said his total fee is reflected on the HUD Settlement Statement

11. INNARELLI said he did not verify the buyer's deposits on the properties and that he was never responsible for making sure deposits were made.

12. INNARELLI said in 1999 he had seen a bulletin from Chicago Title Insurance Company notifying closing attorneys to be aware of land flips, how to identify a "flipped" property and informing the attorneys that flipping is illegal. INNARELLI said that by the time he had received the bulletin he had already done a number of closings for BEALS and PETROPOULOS.

13. SSA Leahy asked INNARELLI about the sale of property from C&B Marketing to Gina Hutchinson. Leahy told INNARELLI that approximately $18,000.00 of the sales proceeds from that property went to H & A Realty. INNARELLI said those funds could have been for a referral fee or a finder's fee. When SSA Leahy told INNARELLI that the figure was not disclosed on the HUD Settlement Statement, INNARELLI said he was not sure that it should be. When asked by SSA Leahy if he thought a 50% split of the sale proceeds was an excessive amount to pay for a finders fee, INNARELLI said that sellers can do whatever they want with the sales proceeds.

14. According to INNARELLI, the typical closing lasts for forty to forty-five minutes and he explains every single document to the buyer. When advised that the buyers have told us that they were unaware of the second mortgages recorded on the properties, INNARELLI said he always made the buyer aware that a second mortgage was granted on the property. In fact, the buyers kept a copy of the promissory note. The principal and interest figures are disclosed in the promissory note and the second mortgage is explained to the buyer.

15. The buyer is usually at the closing, but it is not necessary that the sellers be at the closing at the same time. INNARELLI said the sellers may sign paperwork at some other time. INNARELLI said he doesn't recall ever having received a Power-of-Attorney to handle a sale for either BEALS or PETROPOULOS. INNARELLI stated that BEALS or PETROPOULOS always instructed him on how to issue the sale proceed check and that

they would either tell him to issue the checks to themselves individually or to the officers of the corporation.

16. INNARELLI said he prepared the 2000 and 2001 tax returns for Chester Ardolino and Mathew Campagnari. He remembers the non-compete clause in the sales agreement, but was not involved in the negotiations. When asked why Chester Ardolino would have signed a non-compete clause as part of the sale of the Civic Pub to the Manzis and J.N.F., Inc. he said because Ardolino must have been an owner. INNARELLI said he always asks his clients if there are additional income or expenses to be included on the return. INNARELLI said he assumed they gave him everything they had. INNARELLI said he did no other work for Ardolino or Campagnari.

17. INNARELLI said he did GEORGE PETROPOULOS' tax returns, but did not do ELLIOTT BEALS' tax returns.

18. INNARELLI said Kelvin Hines did a couple of closings.

19. INNARELLI said he has no involvement with the appraisals.

20. INNARELLI said he knows Mark McCarthy. McCarthy works for Ivy Mortgage Company and was a realtor at one time. INNARELLI said he knew McCarthy from Attorney Goldman's office.

21. INNARELLI said Roger Kum and Wilfred Changasie were also flipping properties and that Changasie did more than Kum.

22. Anthony Matos was buying FHA property and fixing them up

23. INNARELLI said he moved to Simsbury, Connecticut in 1999. His wife, Cynthia owns the home. She paid $120,000.00 for the land and approximately $500,000.00 for the construction of the house. They have a $500,000.00 mortgage and a $120,000.00 equity loan on the property, both with Webster Bank. INNARELLI said they sold their Agawam property for a $25,000.00 profit.

24. CYNTHIA INNARELLI is a student at UConn Medical School. Previously, she had worked through Year 2000. She had worked for Aetna and was a consultant for Arthur Anderson. Cynthia earned between $120,000.00 and $150,000.00 per year.

25. INNARELLI said he grossed approximately $140,000.00 last year, and his best year was approximately $160,000.00. INNARELLI said his net income was usually $70,000.00 to $90,000.00 per year.

26. INNARELLI said he keeps his IOLTA account on the computer using QuickBooks. He maintains one master sheet and does not keep subledgers. When asked how he keeps track of individual client funds, such as holdbacks, he stated that he just knows. INNARELLI said he maintains one IOLTA account at the United Cooperative Bank. His operating account is run out of his personal checking account.

27. INNARELLI said his real estate files are filed by address, and his tax files are kept by name. INNARELLI said he does no litigation, but does do some pre-trial civil work.

28. After receiving a phone call from Special Agent Marion Benevento, SSA Leahy asked INNARELLI about a folder in his office relating to J.N.F., Inc. INNARELLI said the file belongs to Tom Normand. Normand is an accountant who is representing J.N.F. before the Department of Revenue on a meals tax audit. Normand works out of his house, so INNARELLI let Normand use his office space.

29. INNARELLI said he also did the tax returns for Nikki Manzi and the JNF Corporate return.

*Thomas J. Carroll Jr.*
Special Agent

*John J. Leahy*
Witness

I prepared this memorandum on May 23, 2002, after refreshing my memory from notes made during and immediately after the interview with Albert Innarelli.

*Thomas J. Carroll Jr.*
Special Agent