**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

UNITED STATES OF AMERICA )
                        )
          **v.**           )         **CRIMINAL NO. 04-30046-MAP**
                        )
THEODORE JARRETT, et al.   )
_____)

### DEFENDANT JARRETT'S SENTENCING MEMORANDUM
### IN SUPPORT OF MOTION FOR DOWNWARD DEPARTURE

Defendant Theodore Jarrett ("Mr. Jarrett") submits this memorandum in support of his Motion for Downward Departure. This is a difficult and heartbreaking case. Mr. Jarrett threw away a career as a mortgage broker, faces imprisonment and financial ruin and has put the security and well being of several family members and friends in jeopardy as a result of his actions and inactions as a branch manager of Equicredit Corporation between the spring of 1999 and July, 2001. Mr. Jarrett is ashamed and remorseful for his conduct and understands that his life – and the lives of others – have been permanently altered as a consequence of his bad decisions. He comes before the Court humbled, seeking to protect his son and family members from further pain and to move forward from this aberrant episode in his life.

Counsel for Mr. Jarrett request that the Court impose a sentence of one (1) day incarceration with credit for time served; three years of supervised release with special conditions including twelve (12) months of home detention with electronic monitoring and 1,000 hours of community service. An order of restitution is required by law. In light of the sentences already imposed on others involved in the land flip scheme now before the Court, the sentence requested by Mr. Jarrett is fair and just. Such a sentence is "sufficient, but not greater than necessary," to comply with the statutory purposes of sentencing. See 18 U.S.C. § 3553(a) and

consistent with the advisory sentencing guidelines.  As detailed more fully below, the requested sentence would allow Mr. Jarrett to remain involved in the care and treatment of his son Michael, several dependents, including his sister Celeste, and others in the community who depend upon his emotional support and active involvement in their daily lives.

## I.     History and Characteristics of Mr. Jarrett

Mr. Jarrett is 49 years old.  (Presentence Report ("PSR") at ¶ 298).  He is the youngest of four children born in Springfield, Massachusetts.  Due to his father's employment, he moved often as a child, living in different parts of New England.  (PSR at ¶ 282).  Mr. Jarrett worked his way through college, attending Hampshire College, Holyoke Community College and Springfield Technical College.  (PSR at ¶ 303).  He received a bachelors degree in business administration from Kennedy Western College, and a Masters degree in education from the Springfield Annex of Cambridge College in 1996.  (PSR at ¶ 303).

His career up to 2004 was spent primarily in banking and real estate.  Relevant to this offense, Mr. Jarrett was the branch manager of Equicredit Corporation located in West Springfield, Massachusetts.  He currently lives with his son at a bed and breakfast owned by his life partner, Antonio Martino, in Hatfield, Massachusetts.  (PSR ¶ 296).  Mr. Jarrett manages the bed and breakfast in lieu of paying rent.

Mr. Jarrett was 27 years old when he adopted his son Michael, then aged 4, who had been in and out of foster care and was a ward of the state.  Michael is actually the child of Mr. Jarrett's niece, Carla Soto.  Ms. Soto became pregnant at the age of 14 while living away from her father, Mr. Jarrett's brother, Robert.  As an infant and toddler, Michael was the victim of emotional, physical and sexual abuse.  As a result, he now suffers from several mental and emotional problems.  When Mr. Jarrett adopted Michael, testing indicated that he may be mentally retarded.

Mr. Jarrett hired a live-in nanny and enrolled Michael in a private Montessori school to address his special needs. He became intimately involved in Michael's life and nurtured him through his preteen years.

When Michael reached puberty, an incident traceable to his history of prior sexual abuse, necessitated placing him in The Castle School, an inpatient treatment center and school in Cambridge, Massachusetts. Michael was a resident of the Castle School for approximately three years. During those years, Mr. Jarrett made weekly or more frequent trips to Cambridge from Springfield. He became an important member of The Castle School community and was invited to become a member of the Board of Directors of the school, a position he holds with pride to this day. When Michael had recovered sufficiently to be released from The Castle School, he was enrolled in a Charter school in Springfield and eventually, with the help and intervention of Mr. Jarrett on numerous occasions, obtained both a high school and college degree.

Michael suffers from Choroideremia, an inherited form of blindness which afflicted Mr. Jarrett's two older brothers as well. The disease causes a gradual loss of vision and complete blindness in later life. One of the symptoms of early onset Choroideremia is night blindness. Michael has unfortunately inherited this disease and is experiencing the symptoms of night blindness at this time, which prevents him from driving between the months October through March and from dusk to dawn driving the remaining months of the year.

Michael has a four-year-old son, Austin, as a result of a relationship with a young women he met when he was in college. Austin lives with Michael and Mr. Jarrett on weekends at the bed and breakfast. While Michael is now 26 years old, his daily life is a struggle and he requires the constant emotional support and intervention of his father. Mr. Jarrett also serves as Michael's sole source of transportation due to Michael's night blindness.

Michael recently submitted to a full psychological evaluation by Dr. Andrea Weiss, Psy.D., a licensed psychologist practicing in Newton, Massachusetts. Dr. Weiss' evaluation of Michael was provided to the Probation Department for inclusion in the final PSR for the Court's review. In that evaluation, Dr. Weiss concludes that Michael continues to be a young man at risk: "Michael's father (Mr. Jarrett) provides the structure which allows Michael to be as successful as he is. In the absence of that structure, Michael may decompensate and need the provision of different types of external structure in the form of a hospitalization or incarceration." Evaluation of Dr. Weiss accompanying PSR at 6. Michael requires the daily intervention of Mr. Jarrett to function and survive.

In addition to Michael's daily needs, Mr. Jarrett provides regular support to his family members, his sister Celeste, who is terminally ill with liver cancer, his sister-in-law Cynthia for whom he manages finances and real estate and cares for on a regular basis, and his life partner, Antonio Martino, who suffers from a chronic illness. Mr. Jarrett also serves as the sole legal guardian of two mentally retarded adults, John Tiago and Michael Sweeney. Messrs. Tiago and Sweeney depend on Mr. Jarrett on a regular basis to make all of the legal decisions that affect their daily lives. See Letters accompanying PSR at Tab 4 (Celeste Jarrett), Tab 6 (Cindy Jarrett) and Tab 10 (Jared Joseph).

In sum, Mr. Jarrett is actively involved in all aspects of his son Michael's life, and is a devoted, loving father. He hopes that the sentence imposed by this Court will permit him to continue helping Michael to overcome the abuse he suffered as a child. In addition, he is a critical figure in the lives of several family members and others, all of whom will suffer by Mr. Jarrett's absence should the Court impose a sentence of incarceration.

II.    **Offense Conduct**

Mr. Jarrett fully accepts responsibility for violating the law.  His offense conduct

occurred when he worked for Equicredit as a branch manager from 1996 to July 2001.

Throughout that time period, Equicredit functioned as a grade B/C funding agent for loans

originated through independent mortgage brokers.  After determining that Equicredit might

advance credit to a particular borrower, independent mortgage brokers, many of whom are co-

defendants in this case, were responsible for collecting necessary documents, including

appraisals, income verification statements, and bank deposits, and providing them to Mr. Jarrett

or others on the staff at Equicredit.  A loan processor at the Equicredit Springfield office would

pull an applicant's credit file and forward the mortgage application along with the credit file to

the Equicredit corporate office in Jacksonville, Florida seeking a decision from the underwriting

team concerning whether to approve the proposed loan.  If an application was approved by the

corporate office, the independent mortgage broker would provide any additional documents,

including the property title, to Equicredit's Springfield office.  After the final approval was

provided by the corporate office in Florida, the mortgage funds were disbursed directly to a

closing attorney who would close the loan.  For the Equicredit loans which are the subject of the

Superseding Indictment, co-defendant Albert Innarelli acted as closing attorney.

Mr. Jarrett began his activities with co-defendants and unindicted co-conspirators George

Petropoulos, Michael Bergdoll, Elliot Beals, and Pasquale Romeo in early 1999.  Mr. Jarrett was

not a part of the conspiracy in late 1997 or early 1998 when Messrs. Beals and Petropoulos

formed a partnership (PSR at ¶¶ 49, 52), nor was Mr. Jarrett present for the "summit" meeting

held in approximately mid-1998 between Messrs. Petropoulos, Beals, Bergdoll, Romeo, and

Matos where they agreed not to compete against each other at auctions and to share the profits of

the land flip scheme they had hatched.  (PSR at ¶¶ 49, 52).  In fact, Mr. Jarrett never participated in any meetings between these principals concerning the land flip scheme nor did he share in any of the profits they reaped from the scheme.  Mr. Jarrett never received any of the extra payments made to many of the mortgage brokers and appraisers in this case.  The only financial benefit Mr. Jarrett received was the ability to continue to keep the Equicredit office in Springfield open.  He did not even receive any commissions from the loans approved by Equicredit.

In mid-1999, given the volume of loans generated by Messrs. Petropoulos, Beals, Bergdoll, and Romeo, Mr. Jarrett became aware that false documentation regarding the source of down payments and artificially inflated income information relating to the borrowers was being submitted with the mortgage applications to Equicredit.  Rather than stop this activity, Mr. Jarrett permitted the loan packages to continue to be processed in his office and he forwarded them to the Equicredit corporate office where most were approved.  By July 2001 – approximately one year before the end of the land slip scheme – Equicredit closed its Springfield office for reasons unrelated to the land flip scheme and no further loans were made.

The impact from Mr. Jarrett's poor decisions has been absolutely shattering for Mr. Jarrett and his family.  Mr. Jarrett has endured the humiliation and shame of being labeled a felon.  Notwithstanding an active role in the Springfield community for many years, he has been asked to resign from several boards and withdraw from several business ventures, including construction of affordable housing for HIV/AIDS patients in Springfield.  In October 2001, after the Equicredit office closed,  Mr. Jarrett opened Mulberry Mortgage Co.  After he was indicted in this case, Mr. Jarrett closed Mulberry Mortgage in October 2004 and was forced to surrender his mortgage broker license.

The impact on Mr. Jarrett's family has been equally severe and will no doubt worsen should Mr. Jarrett be incarcerated. His sister Celeste is concerned that she will no longer have the daily contact with Mr. Jarrett that she finds so necessary to assist in her battle with cancer. See Letter of Celeste Jarrett accompanying PSR at Tab 4. Mr. Jarrett's son Michael lives with the daily fear that he will be separated from his father. See Letter of Michael Jarrett accompanying PSR at Tab 1. His life partner, Antonio Martino, worries that his chronic health issues will be further compromised by the stress of incarceration and the added responsibilities that would fall on him should Mr. Jarrett be incarcerated. See Letter of Antonio Martino accompanying PSR at Tab 3. As the letters accompanying the PSR illustrate, a sentence of incarceration would have a profound negative effect on many who rely on Mr. Jarrett for basic daily needs. See various letters accompanying PSR.

## III.    **Argument**

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the U.S. Sentencing Guidelines were advisory only. In the aftermath of Booker, Courts grappled with the question of how to approach sentencing. That question was answered early this year by the First Circuit in United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006):

> [A]t sentencing, the district court must continue to consider the Guideline Sentencing range… in most cases, this will mean that the district court will have to calculate the applicable guideline range, including resolution of any factual or legal disputes necessary to that calculation – unless they do not matter – before deciding whether to exercise its new found discretion to impose a non-guideline sentence.

440 F.3d at 518.

Although the guidelines have become advisory rather than mandatory, determining the guideline sentencing range ("GSR") remains an appropriate starting point for determining a sentence. Once a sentencing court has determined an applicable GSR, including a consideration

of any appropriate departures, it must then evaluate the sentencing factors set out in 18 U.S.C. § 3553(a), along with any other relevant considerations.  United States v. Alli, 444 F.3d 34, 40 (1st Cir. 2006).

> A.    Guideline Analysis

> > 1.    *The PSR*

The Probation Department, in its PSR, has applied the method utilized by this Court in United States v. Paul Starns, Cr. No. 05-30014-MAP in calculating the loss attributable to the land flip scheme.  Pursuant to this method, the Probation Department calculated the loss attributable to each defendant by subtracting from the total amount of loans in which each defendant participated the amount of money paid by the principal conspirators for the property prior to the loan being sought.  (PSR at ¶ 268).  With regard to Mr. Jarrett, the resulting loss under this methodology is $1,949,817.   (PSR at ¶ 269).  As a result, pursuant to U.S.S.G. §§ 2B1.1(a) and (b)(1),  the base offense level of 6 is enhanced by 16 levels.

The Probation Department also applied a four-level increase pursuant to U.S.S.G. § 2B1.1(b)(2)(A) for multiple victims.  (PSR at ¶ 269).  A one-level enhancement was added due to the money laundering charge pursuant to U.S.S.G. § 2S1.1(b)(2)(A) and the Probation Department included an additional two-level enhancement for abuse of a position of trust pursuant to U.S.S.G. § 3B1.3.  (PSR ¶¶ 270-71).  Due to Mr. Jarrett's acceptance of responsibility, his offense level was reduced by three-levels under § 3E1.1.  (PSR at ¶ 275).  All told, the Probation Department arrived at an adjusted offense level of 26, which corresponds to a GSR of 63-78 months.  (PSR at ¶ 314).   For the reasons that follow, Mr. Jarrett maintains that the GSR as calculated is in error, and vastly overstates what is required in his case to achieve the legitimate objectives of sentencing under 18 U.S.C. § 3553(a).

2.    *Calculation of Loss*

The Starns loss methodology has no application to Mr. Jarrett, as it takes into account losses that were not "reasonably foreseeable" to him and, therefore, contravenes the express guidance of the Sentencing Commission.  Under the guidelines, "intended loss" is "the pecuniary harm that was intended to result from the offense" and includes all losses *reasonably foreseeable* to a defendant.  U.S.S.G. § 2B1.1,  cmt. n.3(A)(ii) (emphasis added); United States v. Alli, 444 F.3d 34, 38 (1st Cir. 2006).  The Government has put forth no evidence that Mr. Jarrett knew or had reason to know the prices at which the properties in the Superseding Indictment were purchased by his co-defendants prior to submitting the fraudulent loan applications.  See PSR at ¶¶ 49, 52.  Thus, it would be unreasonable and unfair to take the prices at which the principal co-defendants purchased the properties into account when measuring the amount of loss for which Mr. Jarrett should be held responsible.  For sentencing purposes, "the court is required to make an individualized finding as to [the conduct] attributable to, or foreseeable by, *that* defendant." United States v. Colon-Solis, 354 F.3d 101, 103 (1st Cir. 2004)(emphasis added).  See also U.S.S.G. § 1B1.3.

Counsel submits that the loss attributable to Mr. Jarrett must be based on what he knew or reasonably should have known at the time the offense was committed.  Although unaware of the original purchase prices of the subject properties by the principal co-defendants, Mr. Jarrett was aware of the amounts pledged as collateral in securing the loans.  Similarly, based on his experience in the banking industry, he was knowledgeable about the foreclosure process generally and the likelihood that Equicredit would recoup some of the collateral value of each property at a foreclosure sale.  When considering what harm was  "reasonably foreseeable" to

Mr. Jarrett, therefore, the Court must offset the loss by the collateral and amounts recouped at foreclosure sales.

Indeed, the Sentencing Guidelines explicitly direct that the amount of loss *shall be reduced* by:

> (i) the money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.

> (ii) In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

U.S.S.G. § 2B1.1, cmt. n.2(E).  See also, United States v. Bennett  37 F.3d 687, 695 (1st Cir. 1994) (holding under predecessor guideline, § 2F1.1, that the amount of loss attributable to a bank fraud defendant is (1) "the amount of the illegal loans (i.e., those for which [the defendant] was convicted), plus (2) the amount of the loans constituting relevant conduct, less (3) the amount of the loans in 1 and 2 repaid as of the time the offense was discovered, less (4) the amount the lender has "recovered (or can expect to recover) from any assets pledged to secure the loans in 1 and 2" (i.e., collateral))[1]; United States v. Madrigal 2006 WL 535956 at *1 (9th Cir. March 3, 2006)("the price received for the sale of each of the foreclosed properties was subtracted in calculating the loss associated with each foreclosed mortgage loan").

Because Mr. Jarrett had reason to know – and did know – that collateral was pledged and foreclosure sales were possible, such amounts should be considered when calculating what loss was reasonably foreseeable to him.  The Government simply has not shown that Mr. Jarrett was aware of any of the purchase prices paid by his co-defendants (or even of the prior sales

---

[1] In fact, the only circumstances in which collateral should *not* be an offset is when the government proves that the defendant intended to deprive the victim of the collateral, such as when a defendant pledges worthless collateral to secure a fraudulent loan and has absolutely no intention of paying it back.  See, e.g., U.S. v. Cooley, 68 Fed. App. 804, 806 (9th Cir. 2003)(the Court refused to credit collateral pledged against some of the loans because it found that the collateral was itself part of the fraudulent scheme and not intended to reduce the amounts defrauded).

themselves) and thus, Mr. Jarrett cannot be held responsible for the differential between the subsequent loans and the prior purchase prices. Consistent with the guidelines, the "loss" attributable to Mr. Jarrett must be offset by "the money returned or the fair market value of the property returned before the offense was detected" and reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1 cmt. 2(E)(i)-(ii). As the analysis of Holly Ryan, CPA, attached to the PSR as well as the Affidavit of Ms. Ryan filed in the matter of <u>United States v. Albert Innarelli</u> reveals, Equicredit has suffered no financial loss.

### 3. *Money Laundering Adjustment*

Mr. Jarrett does not dispute that a one-level enhancement applies pursuant to § 2F1.1(b)(2)(A) because he pleaded guilty to a conspiracy to launder money under 18 U.S.C. § 1957.

### 4. *Victim-Based Adjustment*

The Probation Department concludes that there were more than <u>50</u> victims from Mr. Jarrett's criminal conduct. (PSR at ¶¶ 263, 268-69). Mr. Jarrett contends that this determination is an error and that the only "victim" of Mr. Jarrett's conduct is Equicredit.

The Government has failed to prove that the individual buyers are "victims" for purposes of sentencing. <u>See, e.g.</u>, <u>United States v. Mohammed</u>, 315 F.Supp.2d 354 (S.D.N.Y. 2003)("victims" of defendant's scheme to steal credit information and use it to obtain credit cards, convenience checks, and other lines of credit included only the seven merchants or financial institutions that ultimately bore losses from fraud, not the twenty plus individuals whose stolen credit information was in defendant's possession or whose credit was actually

utilized); see also United States v. Rostoff, 53 F.3d 398, 405 (1st Cir. 1995)(where defendant condominium buyers misrepresented buyers' down payments to bank, the district court noted that one factor contributing to the magnitude of the loss was the buyers' role as "neither dupes nor victims in the traditional sense . . . they had become willing participants in the defendants' scheme").

The following is only a sample of properties where the buyers were aware of misstatements or fraud, and engaged in it at some level:

a.      30-32 Austin Street (count 7), an Edward Page property.  See item (d) below concerning Mr. Page using John Kitovitch's identity to purchase another property.  This demonstrates Mr. Page's full participation in using fraudulent methods to secure loans.

b.      The buyer of 34 Daytona Street (count 16) was complicit in falsifying a bill of sale for an automobile she neither owned nor sold.

c.      The buyers of 935 Carew Street (count 22) were complicit in the falsification of tax records and the creation of a false checking account balance.

d.      The buyer (John Kitovitch) of 13-15 Maple Street (counts 26, 47) was complicit in creating a false gift letter and in allowing Edward Page to use his identity to purchase the house.  In exchange, Mr. Page paid Mr. Kitovitch $2,000.00.

e.      The buyer of 172 Quincy Street (count 33) was complicit in the creation of a false monthly income statement.

f.      The buyer of 108 Raney Street (count 37) was complicit in making it look as though she had down payment funds in her bank account by depositing a check from co-defendant Mark McCarthy that she knew would not clear.

g.    The buyers of 100-104 Greene Street (count 39) created a false bank account by attaching their names to a Ridgewood Properties account (owned by co-defendant Michael Bergdoll), to make it look as though they had funds for a down payment.

There is no evidence in the record that the individual buyers suffered any *actual* loss. See, e.g., United States v. Arnaout, 431 F.3d 994 (7th Cir. 2005)(insufficient evidence in the record that defendant caused actual loss to more than 50 people; the district court erred in applying this enhancement because there was no showing that the funds of more than fifty donors were illegally diverted and used for non-charitable purposes).  The PSR includes a statement that "most of the buyers were foreclosed upon and lost whatever equity they had put into their homes."  However, even if the buyers were *exposed* to loss, without proof of actual loss to multiple victims, the enhancements contained in § 2B1.1(b)(2) cannot apply.  United States v. Lewis, 2004 WL 376828 *3 (6th Cir. 2004)("While the evidentiary standard at a sentencing hearing is low, it is not nonexistent. The government's mere allegation in [the PSR] that seven individuals were victims of Lewis' conduct is not sufficient proof that seven individuals suffered 'actual loss' within the meaning of the guidelines' language."); United States v. Gray, 2003 WL 21683709 (5th Cir. 2003)(two-level sentencing enhancement for having more than ten and fewer than fifty victims did not apply to situation in which defendant who pried off mailbox panels in apartment building, exposing 42 individual mailboxes; although anyone who had mail could properly be counted as a victim for purposes of the guideline, there was no indication that there were at least ten people who had mail in their mailboxes).

Because the burden of proof falls on the party seeking the enhancement, see United States v. Sepulveda, 115 F.3d 882, 889 (11th Cir. 1997) in this case the government has not satisfied its burden by demonstrating that each of the buyers were innocent victims.  In fact,

many of the purchasers were complicit in the wrongdoing, and it would be unfair and contrary to case law to characterize these individuals as victims. Because the Government has not met its burden, a four-level adjustment pursuant to § 2B1.1(b)(2)(A) is inappropriate.

5.    *Adjustment for Abuse of Trust, U.S.S.G. § 3B1.3*

Section 3B1.3 of the guidelines permits a sentencing court to increase a defendant's offense level by two if the defendant: (1) occupied a position of trust, vis-a-vis his employer; and (2) utilized his position of trust to facilitate or conceal his offense. See United States v. Reccko, 151 F.3d 29, 31 (1st Cir. 1998), United States v. Lee, 324 F.Supp. 2d 165,166 (D. Me. 2004). According to the sentencing guidelines, a "position of public or private trust" is marked by professional or managerial discretion. U.S.S.G. § 3B1.3 cmt. n.1.

Consistent with the guideline commentary, the Court of Appeals for the First Circuit has defined a "position of trust" as a position "characterized by professional managerial discretion (i.e., substantial discretionary judgment) that is ordinarily given considerable deference." United States v. Reccko, 151 F.3d at 31. See also United States v. O'Connell, 252 F.3d at 524, 528 (1st Cir. 2001). Utilizing this definition, the First Circuit held that a bank executive would qualify for upward adjustment, but a bank teller would not. O'Connell supra at 28. For the enhancement to apply, the employee's position must have contributed in some significant way to the commission or concealment of the offense. United States v. Reccko, 151 F.3d at 31.

Mr. Jarrett's position at Equicredit was more analogous to a bank teller than a bank executive. Mr. Jarrett had no discretion to approve or deny loans. His job was to oversee a branch office which was required, when a customer requested a mortgage loan to forward a loan package to corporate underwriters at the corporate office in Jacksonville, Florida for evaluation and approval. As set forth above, independent mortgage brokers collected the necessary loan

documentation, including appraisals, income verification statements and bank deposits, and provided those documents to Mr. Jarrett or a staff member of the branch office. The Equicredit loan processor at the branch office would pull the applicant's credit file and forward the loan application package, with backup documentation and the credit file, to Equicredit's corporate office in Florida. Mr. Jarrett had neither the opportunity nor the authority to approve any loans, open any accounts, or increase any credit lines. While Mr. Jarrett may have abused his position at Equicredit, he lacked the necessary professional managerial discretion to merit an upward adjustment for abuse of trust under the sentencing guidelines in this case. See <u>United States v. O'Connell</u>, 252 F. 3d at 528.

6.    *Alternative Guideline Determination*

Mr. Jarrett submits the following table which summarizes the appropriate guideline calculation in this case, incorporating the sentencing issues raised by the defendant set forth above.

| **TABLE 1 (utilizing Defendant's loss methodology)** | |
| --- | --- |
| Base offense level 2B1.1(a) | 6 |
| Specific Offense Characteristics | |
| § 2B1.1(b)(1)(G) Loss Enhancement | 0 |
| § 2B1.1(b)(2)(A)(i) Victim Enhancement (more than 10 less than 50 victims) | 0 |
| § 2S1.1(b)(2)(A) Enhancement for violation of 18 U.S.C. § 1957 | 1 |
| § 3B1.3 Enhancement for abuse of trust | 0 |
| § 3E1.1(a)(b) Reduction for acceptance of responsibility | -2 |
| TOTAL OFFENSE LEVEL | 5 |
| Guideline Sentencing Range | 0 to 6 months |

If this Court were to apply the <u>Starns</u> loss methodology, but were to agree with the balance of Mr. Jarrett's guideline analysis concerning specific offense characteristic

enhancements (e.g., multiple victims and role in the offense), the following calculation would apply:

| TABLE 2 (utilizing Starns loss methodology) | |
|---|---|
| Base offense level § 2B1.1(a) | 6 |
| Specific Offense Characteristics | |
| § 2B1.1(b)(1)(G) Loss Enhancement ($1.95M) | +16 |
| § 2B1.1(b)(2)(A)(i) Victim Enhancement (more than 10 less than 50 victims) | 0 |
| § 2S1.1(b)(2)(A) Enhancement for violation of 18 U.S.C. § 1957 | 1 |
| § 3B1.3 Enhancement abuse of trust | 0 |
| § 3E1.1(a)(b) Reduction for acceptance of responsibility | -3 |
| TOTAL OFFENSE LEVEL | 20 |
| Guideline Sentencing Range | 33-41 months |

7.    *Grounds for Departure*

a.    The Loss Overstates Seriousness of the Offense

Mr. Jarrett's case is one in which the offense level determined under the guidelines substantially overstates the seriousness of his offense conduct. U.S.S.G. § 2B1.1 , cmt. 15(B). A downward departure is warranted. United States v. Maldonado-Montalvo, 356 F.3d 65, 69 (1st Cir. 2003)(Guidelines permit a downward departure where the total loss calculation overstates the seriousness of the offense). See also United States v. D'Andrea, 107 F.3d 949, 955-56 (1st Cir. 1997); United States v. Shattuck, 961 F.2d 1012, 1016-17 (1st Cir. 1992). As the Court observed in United States v. Emmenegger, 329 F.Supp. 2d 416, 427 (S.D.N.Y. 2004) "[i]n many cases … the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." "Loss may well be a kind of accident, pending on the

fortuities of law enforcement or even the market, as much as the defendant's culpability.  United States v. Mueffelman, 400 F.Supp. 2d 368, 373 (D. Mass. 2005)."

In United States v. Mueffelman, 400 F. Supp. 2d 368 (D. Mass. 2005), the Court discounted the sentencing range three levels because "the amount of loss did not serve as a fair proxy for [the defendant's] culpability."  Id. at 379.  In so doing, the Court relied on United States v. Forchette,  220 F.Supp.2d 914 (E.D. Wis. 2002).  The Forchette Court explained the four basic situations in which a "loss overstates the seriousness" departure may be appropriate: (1)  multiple causation scenario; (2) economic reality principle; (3) unusual conduct or role; and (4) extraordinary restitution or remedy.  Id. at 924-925.  In explaining the "unusual conduct or role," the court stated:

> For example, the defendant may have had a limited or inferior role in the fraud that bore little relationship to the amount of the loss; he may have had little or no knowledge of the amount being taken, such that it would be unfair to attribute the entire amount of loss to him; his intent in involving himself in the scheme may have been significantly different than of the usual fraud defendant, *e.g.* he may have entered the scheme with honest intentions or with the intent to make good on his obligations;  his fraudulent representation may have been of limited materiality, as where he could have obtained a loan by truthful means but at a higher interest rate;  or the defendant's fraud may have been for little or no gain, especially in comparison to the size of the loss.

Id. at 925.  The Forchette Court departed based on the defendant's "unusual role" because, "Even though the loss was limited to the checks with which defendant was personally involved, his role was nevertheless limited in 4 important ways.  First, he did not devise the scheme.  Second, defendant did not steal or draft the checks and thus did not determine the amount of loss.  Third, his gain was grossly disproportionate to the amount of loss.  And fourth, he was unaware of the nature and scope of the scheme and was thus less culpable than the typical participant in a half-million dollar fraud case."  Id. at 926.

In this case, Mr. Jarrett's role in the offense conduct was similarly limited in four significant ways. First, he did not devise the scheme; he was not present at any of the meetings between his co-conspirators and he did not participate in the purchase of any of the distressed properties involved in the land flip scheme. Second, Mr. Jarrett had no control over the amount of the mortgages that were sought, nor did he prepare or approve the fraudulent mortgage applications and thus had no control over determining the amount of loss. Third, Mr. Jarrett, among all of the defendants, realized absolutely no gain from the offense conduct. Unlike the co-defendant appraisers or independent mortgage brokers who received commissions or extra payments for their role in the land flip scheme, Mr. Jarrett received nothing for his participation in the offense. Moreover, unlike the principals Petropoulos, Bergdoll, Beals and Romeo, Mr. Jarrett shared in none of the profits that were generated by the co-defendants conduct. Finally, Mr. Jarrett was unaware of the nature and the scope of the scheme, and was thus less culpable than a typical participant in a multi-million dollar fraud case. See United States Forchette, 220 F.2d at 925-27. For all of these reasons, Mr. Jarrett respectfully requests that the Court depart downward from the loss amount contained in the PSR to a level permitting the Court to impose the requested sentence.

           b.    Extraordinary Family Responsibilities

Section 5H1.6 authorizes a downward departure from the Guidelines Sentencing Range for extraordinary family circumstances. The defendant can qualify for this departure if he is "irreplaceable." See United States v. Pereira, 272 F.3d 76, 82 (1st Cir. 2001). As described in the PSR and the letters in support of Mr. Jarrett accompanying the PSR, he has extraordinary family responsibilities. Many people depend on him for their very basic life needs, including housing, financial and emotional support.

Mr. Jarrett is a single parent to his son, Michael.  Michael depends on him financially and emotionally and would not be able to live on his own if Mr. Jarrett is incarcerated, as demonstrated in the attached Evaluation by Dr. Weiss.  Mr. Jarrett provides his son's transportation due to Michael's progressive blindness.  Without Mr. Jarrett, Michael would not be able to care for his son, Austin, and thus would be unable to maintain his visitation with him. Michael has no one else.  As demonstrated in the letters of support, Mr. Jarrett's family members have their own financial, health and emotional burdens and would be of little support to Michael, who requires extraordinary care and structure.  Should Mr. Jarrett be imprisoned, Michael would not have anywhere to go or anyone to turn to.  The Evaluation of Michael Jarrett and the Letters of Michael Jarrett, Carla Soto, and Jewel Gilbert among others, demonstrate Michael's delicate state and the irreplaceable care and support he receives from Mr. Jarrett. <u>See</u> Evaluation by Dr. Weiss accompanying PSR; Letters accompanying PSR at Tab 1 (Michael Jarrett); Tab 2 (Carla Soto); (Jewell Gilbert).[2]

Mr. Jarrett also supports his sister-in-law, Cynthia ("Cindy") Jarrett.  Mr. Jarrett was an important source of support for Cindy when his brother Robert died in 2000.  Since then he has taken care of Cindy's finances, managed her properties, and has been there for her at every turn. In her words, "without Ted's help, I would have been lost and still would be."  The Letters of Cynthia Jarrett and her daughter, Denise Kushner, further describe how Cindy needs Mr. Jarrett on a daily basis.  <u>See</u> Letters accompanying PSR at Tab 6 (Cindy Jarrett); Tab 7 (Denise Kushner).

Mr. Jarrett's sister, Celeste, who is terminally ill, has written that the moral support Mr. Jarrett offers is such that she would be "devastated" if she were not able to speak to him several

---

[2] Ms. Gilbert's letter was not provided to the Probation Department at the time counsel for Mr. Jarrett filed their objections to the PSR and will be provided as a supplement to the Probation Department.

times daily.  The Letters of Celeste Jarrett and her daughter, Devon Palmanteer, describe how Celeste depends on Mr. Jarrett for daily emotional support, and thus helps her to battle her cancer and sustain her.  See Letters accompanying PSR at Tab 4 (Celeste Jarrett); Tab 5 (Devon Palmanteer).

In short, many people lean on Mr. Jarrett for support – financially, emotionally and professionally.  The Court should consider those that rely on Mr. Jarrett when it determines an appropriate sentence and should depart downward due to his "extraordinary family circumstances."  See, e.g., United States v. Lacarubba, 184 F.Supp.2d 89, 98 (D. Mass. 2002)(departure for "extraordinary family obligations" warranted due to need for defendant to provide medication and emotional support to spouse of over thirty years who had incurable liver cancer).

Given all of the people dependent upon Mr. Jarrett, he is truly irreplaceable for purposes of U.S.S.G. § 5H1.6, much like the defendant in United States v. Roselli, 366 F.3d, 58, 68-70 (1st Cir. 2004).  Mr. Jarrett is needed to assist his son Michael with everyday life needs.  As in Roselli, Mr. Jarrett's partner is unable to fully support Michael's needs and no feasible alternative to Mr. Jarrett's involvement exists.  Even hiring a full time caregiver, to the extent that were economically feasible, is no solution either; as Roselli recognizes, a paid caregiver cannot provide the emotional support needed by a child such as Michael.  See United States v. Roselli, 366 F.3d at 70 (affirming downward departure for extraordinary family circumstances); see also United States v. Lacarubba, 184 F.Supp. 2d 89, 98 (D. Mass. 2002) (granting departure and rejecting the need to hire a caregiver, "caregiver goes beyond physical acts and includes emotional and psychological attachments.  It is not just a question of any two arms, any old paychecks").

In many respects, Mr. Jarrett's case presents a more compelling situation than the case most frequently cited in the First Circuit involving an irreplaceable defendant, United States v. Sclamo, 997 F.2d 970, 972-74 (1st Cir. 1993).  In that case, the defendant claimed that his presence was needed to care for a 12  year old boy – not the defendant's son – who suffered from ADHD.  A psychologist opined that the boy risked a serious set back if the defendant were in prison.  In affirming the downward departure, the First Circuit concluded that the psychologist's opinion supported the district court's conclusion that there was an extraordinary family circumstance justifying the departure.  United States v. Sclamo, 997 F.2d at 972-74.

Mr. Jarrett is essential to the care of his son and has been heavily involved in his care and treatment since his adoption.  Dr. Weiss has opined, in the absence of the structure provided by living with Mr. Jarrett, "Michael may decompensate and need the provision of different types of external structure in the form of hospitalization or incarceration."  See Evaluation by Dr. Weiss accompanying the PSR at 6.  For this reason, the Court should depart downward pursuant to U.S.S.G. § 5H1.6 to a level permitting the imposition of the requested sentence.

c.      Vulnerability to Abuse in Prison

A defendant's unusual susceptibility to abuse by other inmates while in prison may warrant a downward departure.  Koon v. United States, 518 U.S. 81, 98 (1996).  Whether a defendant is homosexual or bisexual is a strong consideration in assessing a defendant's vulnerability to prison abuse.  See, e.g., United States v. Lara, 905 F.2d 599, 605 (2d Cir. 1990)(bisexual defendant's personal characteristics made him particularly vulnerable to prison abuse, warranting a downward departure).  Mr. Jarrett is openly gay and has a soft and extraordinarily caring manner, as evident from the many letters in support of his character.  His

homosexuality and demeanor will make him especially vulnerable to sexual and physical abuse in prison.

d.    <u>Substantial Assistance</u>

Undersigned counsel and counsel for the Government have discussed Mr. Jarrett's substantial assistance in this investigation.  As a result of such discussions and Mr. Jarrett's assistance, the Assistant U.S. Attorney has sought authority from the Substantial Assistance Committee of the U.S. Attorney's Office to file a motion for downward departure pursuant to U.S.S.G. § 5K1.1.  It is undersigned counsels' understanding that that request remains pending at the time of this filing.

## IV.    Mr. Jarrett's Requested Sentence Is Appropriate Under 18 U.S.C. § 3553

As detailed above, several grounds exist, either alone or in combination, to depart downward to a guideline sentencing range that permits Mr. Jarrett's requested sentence of one (1) day incarceration with credit for time served, followed by three years supervised release to include 12 months of home detention and 1,000 hours of community service.  The factors identified in 18 U.S.C. § 3553 also support this sentence.

### A.    The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Mr. Jarrett has no other involvement with the criminal justice system or any regulatory or licensing authority.  Prior to his indictment in September 2004, he led a law-abiding existence focused on his family, his work, and his community.  He is deeply committed to his family and has been and hopes to remain heavily involved in the care of his son and sister.  It is not an exaggeration to say that his uninterrupted involvement in Michael's daily care, as well as the care of his sister, Celeste, is essential if both are to continue the progress they are making against the conditions they suffer.

22

There is no doubt that Mr. Jarrett was wrong to participate in the land flip conspiracy hatched by others.  His guilty plea reflects that recognition and acceptance of responsibility.  But in the spectrum of defendants participating in this event and other like multi-million dollar fraudulent schemes, Mr. Jarrett's conduct falls toward the least culpable end.  He was not an insider, he did not devise the scheme, he did not share in the fruits of the illegal scheme, and did nothing to corrupt or persuade anyone to violate any laws.  Simply put, he was aware of fraudulent activity, agreed to participate in it, and failed to notify his employer or law enforcement authorities of the scheme.  The decision to participate in this conspiracy will be a decision he will forever regret.

Beyond the extensive family connections and responsibilities set forth above, Mr. Jarrett's history of public service and his record of prior good works may be considered by the Court in fashioning a just sentence.  See e.g., U.S.S.G. § 5H1.11.  Mr. Jarrett has made Springfield his home for over 20 years.  Throughout that period in time, he has worked hard to make Springfield a better place by contributing to historical preservation through his involvement with the Preservation Trust and the restoration of various properties.  See Letter of Jewel Gilbert.  In addition, he has worked tirelessly to provide affordable housing for HIV positive people in the community.  See id.  All of the letters provided to the Court in support of Mr. Jarrett's requested sentence discuss his good works and public service one way or another.  In particular, letters from James Boone, James Howie, Gary Hubert, Wendy Palmer, Harley Tinney, Mark Anderson and Jewel Gilbert describe his work in the community at large.  See Letters accompanying the PSR.  Mr. Jarrett also serves as the unpaid legal guardian of two mentally retarded adults, John Michael Sweeney and John Tiago.  The letter from Jared Joseph

explains in greater detail Mr. Jarrett's involvement, history and good works with these two gentlemen.  See Letter of Jared Joseph accompanying PSR at Tab 10.

The nature of the offense, coupled with Mr. Jarrett's otherwise spotless character and demonstrated record of public service and good works, argues in favor of leniency.

B.    The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment

The government's investigation and prosecution of Mr. Jarrett has been severe and truly life-altering.  As a result of a series of poor decisions, Mr. Jarrett will forever be labeled a felon and be barred from holding any number of positions requiring licenses, including the mortgage banking industry.  The Court's order of restitution will deplete whatever remaining assets Mr. Jarrett holds.

In light of these impacts, there is little need to impose a sentence of incarceration.  No citizen could credibly look at this sad situation and conclude that Mr. Jarrett got away with anything.  His reputation has been ruined; he has been barred from participating in his chosen profession.  While he gained nothing from the criminal activity, he will nevertheless be forced to pay restitution to Equicredit and face additional crushing financial burdens; and, whatever the Court's sentence, his liberty will be significantly restrained for the foreseeable future. Furthermore, should the Court impose the sentence requested by counsel, Mr. Jarrett will be required to complete 1,000 hours of community service.  Already, AIDS CARE/Hampshire County has offered to accept Mr. Jarrett as a volunteer to satisfy any community service requirement.  Such community service to those afflicted with HIV/AIDS in the Springfield area will further satisfy the sentencing factors of § 3553(a).

C.    Adequate Deterrence

The preceding section demonstrates that the consequences of Mr. Jarrett's criminal activity have forever changed his life in a dramatic matter.  The public interest in specific deterrence has been plainly satisfied; Mr. Jarrett understands that his crimes carried with them severe consequences and he poses little risk of recidivism in these circumstances.  Moreover, the public's interest in general deterrence will also be satisfied by the requested sentence, as anyone looking at this situation would conclude that Mr. Jarrett has been severely punished for his criminal activity:  a long period of home detention, publicly visible community service, a significant payment of restitution, and potentially crushing financial penalties; the permanently debarment from the mortgage and banking industry and other professions as a result of the felony conviction. and the clear humiliation and public embarrassment that accompanies a felony conviction sends a clear message of deterrence to the public at large.  Substantial punishment has been and likely will continue to be visited upon Mr. Jarrett as a result of his criminal conduct. There will be little incremental deterrent impact achieved by imposing a sentence of incarceration.

D.    Need to Avoid Unwarranted Sentencing Disparities

18 U.S.C. § 3553(a)(6) reminds of the need "to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  In Booker's wake, courts have explicitly recognized the appropriateness of avoiding unwarranted disparities and sentences among the participants in a criminal scheme.  See United States v. Jaber, 362 F.Supp. 2d 365, 381 (D. Mass. 2005).  If Mr. Jarrett was sentenced anywhere within the guideline sentencing range set forth in the PSR, the sentence would be grossly

disproportionate to the sentences imposed on Messrs. Innarelli, Frederick and Lynch thus far in this case.

While it is clear that this Court is best situated to determine the relevant degrees of culpability between the defendants who have been sentenced in this case, Mr. Jarrett submits that he is among the least culpable of the defendants that come before the Court. The requested sentence takes into account Mr. Jarrett's culpability vis-à-vis his co-defendants and achieves appropriate sentences among the defendants.

**V.    Conclusion**

Mr. Jarrett respectfully requests that the Court grant a departure downward based on the arguments set forth above, as well as the factors set forth in § 3553(a). Even if the Court finds that none of the departure or § 3553(a) factors argued above taken alone justifies a departure downward, it may depart based on the aggregation of all of these factors. United States v. Coleman, 188 F.3d 354, 360 (6th Cir. 1999); see also United States v. Broderson, 67 F.3d 452, 458-59 (2d Cir. 1995) (aggregation of factors including that the loss overstates the seriousness of the offense and restitution was paid, justified a departure even though no individual factor did). In the present case, the circumstances warrant a departure downward to the recommended sentence and Mr. Jarrett respectfully request that the Court impose such a sentence.

Respectfully Submitted,

THEODORE JARRETT
By his Attorneys,
/s/ Maria R. Durant
_____
Maria R. Durant (BBO No. 558906)
William H. Kettlewell (BBO No. 270320)
Dwyer & Collora, LLP
600 Atlantic Ave.
Boston, MA 02210-2211
(617) 371-1000

## <u>CERTIFICATE OF SERVICE</u>

     I, Maria R. Durant hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 2nd day of October, 2006.


               /s/ Maria R. Durant

               _____

               Maria R. Durant